EXHIBIT A



JACKSONWHITE
ATTORNEYS AT LAW
*A Professional Corporation*



COPY

NOV 1 8 2010

MICHAEL K. JEANES, CLERK
A. JAMES
DEPUTY CLERK

40 North Center Street, Suite 200
Mesa, Arizona 85201
Telephone No.: (480) 464-1111
Facsimile No.: (480) 464-5692
Email: centraldocket@jacksonwhitelaw.com
*Attorneys for Plaintiffs*
By: Michael R. Pruitt, SBN 011792
Email: mpruitt@jacksonwhitelaw.com

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

Jamie L. Basham, a single woman; and
Heather Fox, a married woman filing
individually,

        Plaintiff,

v.

CareerBuilder, LLC, a foreign L.L.C.;
Mark DeChant and Jane Doe DeChant,
husband and wife; Andrew Streiter;
Hunter Arnold; Stacey Swanson; John
and Jane Does I-X; Red Limited
Liability Companies I-X; Black
Corporations I-X; and White
Partnerships I-X,

        Defendants.

CV2010-08.029

Case No.: CV _____

**COMPLAINT**

(Intentional Infliction of Emotional
Distress; Intentional Interference
With a Contractual Relationship;
and Violation of the Family and
Medical Leave Act)

*(Jury Trial Requested)*

    Plaintiffs, Jamie Basham ("Basham") and Heather ("Fox") (collectively "Plaintiffs"), by and through their counsel undersigned, and for their Complaint, allege as follows:

    1.    Basham is, and at all times relevant to this action has been, a single woman residing in Maricopa County, Arizona.

    2.    Fox is, and at all times relevant to this action has been, a married woman residing in Maricopa County, Arizona, who is filing this action individually.

-1-

3.     Upon information and belief, Defendant CareerBuilder, LLC ("CareerBuilder") is a foreign limited liability company doing business in Maricopa County, Arizona.    At all material times hereto, Defendant CareerBuilder was an employer of Plaintiffs.

4.     At all material times hereto, Basham was an employee of CareerBuilder within the definition of 29 U.S.C. § 2601, *et seq.* of the Family and Medical Leave Act ("FMLA").

5.     At all times relevant to this action, CareerBuilder was an employer as defined in 29 U.S.C. § 2601, *et seq.* of the FMLA.

6.     Defendant Mark DeChant was an Area Sales Manager and was also an employer of Basham as defined in 29 U.S.C. § 2601, *et seq.* of the FMLA.

7.     Defendant Andrew Streiter was an Area Vice President and was also an employer of Basham as defined in 29 U.S.C. § 2601, *et seq.* of the FMLA.

8.     Defendant Hunter Arnold was an Area Vice President and was also an employer of Basham as defined in 29 U.S.C. § 2601, *et seq.* of the FMLA.

9.     Defendant Stacey Swanson was an Employee Relations Specialist and was also an employer of Basham as defined in 29 U.S.C. § 2601, *et seq.* of the FMLA.

10.    Defendants Mark DeChant, Andrew Streiter, Hunter Arnold, and Stacey Swanson either acted directly or indirectly in the interest of CareerBuilder in relation to Plaintiffs' employment or otherwise influenced CareerBuilder's decisions as they affected Plaintiffs' employment.

11.    Defendant CareerBuilder was acting through its agents and/or employees, and is therefore liable for the actions of those agents and/or employees under the doctrine of respondeat superior.

12.    Upon information and belief, Defendants Mark DeChant and Jane Doe DeChant are husband and wife, and at all relevant times were both residents of Arizona, residing in Maricopa County, Arizona.   The true name of Jane Doe DeChant is not

presently known to Plaintiffs, but leave of Court will be requested to add her true name when and if it is discovered.

13.    Upon information and belief, all acts alleged in this Complaint against Defendant Mark DeChant were performed on behalf of and for the benefit of Defendants Mark DeChant and Jane Doe DeChant's marital community rendering their marital community liable for the actions of Defendant Mark DeChant.

14.    Upon information and belief, Defendant Andrew Streiter is a resident of Illinois, residing in Chicago, Illinois.

15.    Upon information and belief, Defendant Hunter Arnold is a resident of Illinois, residing in Chicago, Illinois.

16.    Upon information and belief, Defendant Stacey Swanson is a resident of Illinois, residing in Chicago, Illinois.

17.    John and Jane Does I-X, Red Limited Liability Companies I-X, Black Corporations I-X, and White Partnerships I-X, are fictitious individuals or entities who may be liable to Plaintiffs for all or part of their damages.  At this time, the true names of these individuals or entities are not known, but leave of court will be sought to add their true names at such time as they are discovered.

18.    The events giving rise to these causes of action occurred in Maricopa County, Arizona within the jurisdiction of this court.

19.    This court has subject matter jurisdiction over Plaintiffs' claims.

## **BACKGROUND FACTS**

20.    Plaintiffs Basham and Fox are female.

21.    Defendant Mark DeChant was an Area Sales Manager for CareerBuilder and was Plaintiffs' direct supervisor during most of their employment.

22.    Defendant Andrew Streiter held the position of Area Vice President for CareerBuilder during most of Plaintiffs' employment with CareerBuilder.

23.    Defendant Hunter Arnold held the position of Area Vice President for CareerBuilder at the time of Plaintiffs' terminations.

24.     Defendant Stacey Swanson held the position of Employee Relations Specialist for CareerBuilder at the time of Plaintiffs' terminations.

25.     Grant Rose recruited Basham to work at CareerBuilder.  CareerBuilder was a customer of Basham at Global Crossing Telecommunications.  At first, Basham was not interested in a position with CareerBuilder, but Mr. Rose's recruitment efforts persisted.  Basham finally agreed to consider a position and was interviewed by Mark DeChant ("DeChant"), Area Sales Manager, for a national account executive position in June 2007.

26.     DeChant offered Basham the position of national account executive.  Prior to accepting the job, however, Basham told DeChant that it was critical that she be allowed to work from home once she was trained, because it was a 45 to 60 minute drive one way to CareerBuilder's office and because she had worked from home for the previous 15 years.  Basham was insistent on this condition and told DeChant that she would not accept the job if she was not allowed to work from home.

27.     During a second interview with Basham, DeChant consented and agreed to allow Basham to work from home.  He memorialized his commitment to allow Basham to work from home in an email.

28.     Basham accepted the job and began working for CareerBuilder on August 1, 2007 as a national account executive.

29.     Basham has approximately 16 years of experience as a sales representative.

30.     Fox was working at Johnson & Johnson as a medical sales representative when she was recruited by DeChant to work at CareerBuilder.  A friend and former co-worker of Fox at DHL, Erich Wede, who was working in the Seattle office of CareerBuilder, recommended Fox to DeChant for a position as a national account executive.  At first, Fox told DeChant she was not interested in a position with CareerBuilder, but DeChant continued actively recruiting Fox until Fox finally agreed to meet with him.  Fox interviewed with DeChant on February 4, 2008 for a national

account executive position.   During Fox's interview, she and DeChant discussed the requirements of the position, including out-of-state travel.

31.   On February 6, 2008, Fox had a second interview with DeChant at which time he offered her the position of national account executive.   Fox expressed to DeChant that she was hesitant to accept the job because she feared it would require too much travel.   DeChant assured Fox that if she set "high level appointments", which he believed she would, she would not have to travel at all.   He also told Fox that he did not care if she worked from the moon as long as she was "winning."   Based on DeChant's concessions and assurances, Fox understood she would not be required to do significant traveling in her job.   After much persuasion, and a promise that she could earn "$300k annually", Fox accepted DeChant's offer of employment.

32.   Fox began working for CareerBuilder on March 10, 2008 as a national account executive.

33.   Fox has approximately nine years of experience as a sales representative.

34.   Basham and Fox were both fully qualified for their positions as national account executives.   As national account executives, Plaintiffs were responsible for growing and maintaining accounts assigned to them and for growing their territory.

35.   Some of Basham's accomplishments while employed by CareerBuilder include, but are not limited to, receipt of five awards for being the Top National Account Executive in the Phoenix office.   The first award was for August 2007 (her first month of work), September and November 2007, and January and March 2008.

36.   Some of Fox's accomplishments while employed by CareerBuilder include, but are not limited to, winning an award for the Phoenix Office's "Hit the Road, Jack" sales contest in June 2008 for having the most out-of-town meetings.   Fox also exceeded her sales plan each and every month from the beginning of her employment to the date she was terminated.

/ / /

/ / /

-5-

37.     During Plaintiffs' employment with Defendant CareerBuilder, they were subjected to quid pro quo sexual harassment and a hostile work environment because of their sex by their supervisor.

38.     The sexual harassment included frequent inappropriate remarks of a sexual nature, inappropriate sexual behaviors, and solicitations for sex.  Some examples of specific incidents involving Basham include, but are not limited to, the following:

A.     On September 20, 2007, Basham's team, along with DeChant, were required to attend a team retreat in Sedona, Arizona.  At the dinner table that evening, DeChant asked two of the female sales associates, Giselle Callahan and Jeanne Serene, to kiss each other so that he could take a picture.  Both women were extremely shocked and embarrassed by DeChant's request, and declined.

B.     During dinner at this team retreat, DeChant consumed a large amount of alcohol and became loud and obnoxious.  After dinner, DeChant told all of the sales associates to go to his hotel room.  Once in the room, DeChant began to rap and break dance.  The lyrics to DeChant's rap song were extremely offensive.  Basham specifically remembers the words N*****, f**k, and f**king being used, as well as other extremely offensive words.

C.     After this, DeChant told the sales associates that he loved to put Gold Bond powder on his "balls."  DeChant then grabbed a bottle of Gold Bond powder, which happened to be nearby, pulled open his pants, poured the powder down his pants, and put his hand into his pants to shake the powder around.  DeChant told the sales associates that he always kept a bottle of Gold Bond powder in his office at work and applied it throughout the day, and that the next time they were in his office to look at it, they would be reminded of how it makes his "balls" feel.

D.     On October 19, 2007, Basham had several appointments with customers in Las Vegas, Nevada.  DeChant told Basham that she was still so new he wanted to attend Basham's meetings with her.  Basham flew to Las Vegas the night before her meetings.  The next morning, Basham received a call from DeChant.

DeChant told Basham that she needed to come to his hotel room to review and prepare for their meetings.  Basham took a cab to DeChant's hotel and went to his room as she was told.  When DeChant answered the door of his hotel room, he was not completely dressed.  Basham took a seat at the table in DeChant's room and waited while DeChant finished dressing.  DeChant commented to Basham while he was getting dressed that his wife would be jealous if she knew that Basham was in his hotel room, how excited he was to have Basham there, and that he was going to dream about Basham being in his hotel room that night.

E.      On December 6, 2007, a holiday party was held at a local restaurant for all employees and their spouses or significant others.  In the middle of dinner, DeChant stood up and began rapping X-rated Christmas carols.  One was "Have Yourself a Horny Little Christmas" sung to the tune of "Have Yourself a Merry Little Christmas."  The lyrics had been changed by DeChant to include references to "sex" and "orgasms."  At the conclusion of the song, DeChant asked Basham in front of her ex-husband, who accompanied Basham to the dinner, when was the last time she had an orgasm.

F.      DeChant then began singing a song, "Dick in a Box."  This song also included offensive lyrics and hand gestures.  After the song, DeChant told everyone that he was a member of a band called "The Rapping Vaginas" and these were songs he had written.

G.      On January 8, 2008, Basham and a female co-worker, Jeanne Serene, were scheduled to attend CareerBuilder's annual kick off meeting in Chicago, Illinois.  DeChant also attended the kick off meeting.  As soon as Basham and Ms. Serene's flight landed in Chicago, Basham's cell phone began ringing.  It was DeChant calling Basham asking her where she was.  DeChant said he was excited for Basham to arrive.  DeChant also called Basham several times during the cab ride from the airport to the hotel telling her to hurry.  When Basham and Ms. Serene's cab arrived at the hotel, DeChant was waiting outside the hotel.  As soon as Basham exited the cab, DeChant

gave her a big hug and said he was so happy she was there. DeChant followed Basham and Ms. Serene into the hotel lobby to check in. Ms. Serene checked in first. When Basham tried to check in right after Ms. Serene, however, she was told that the hotel had overbooked and there were no more rooms available. DeChant very excitedly told Basham that his biggest fantasy was about to come true. DeChant said Basham was going to have to sleep with him. He said he was sure his wife would not mind.

H.    In or around February 2008, Basham's computer crashed. Basham was leaving town early the next morning on a business trip and had to have a computer to take with her. Basham called DeChant and he offered (because it was late afternoon) to bring a laptop home with him that evening and Basham could pick it up at his house, since that was much closer than driving to the office in Scottsdale. Basham agreed. Basham and DeChant agreed that DeChant would call Basham when he arrived home so that she could come by and pick up the computer. When DeChant called Basham to come to his house to pick up the computer, he said his wife was out of town and asked Basham if she wanted him to answer the door in his underwear or naked.

I.    On March 20, 2008, Basham and DeChant again traveled to Las Vegas to meet with customers. Basham intentionally stayed at a different hotel than DeChant. They were to meet in the lobby of DeChant's hotel before their meetings. After Basham arrived at DeChant's hotel, DeChant said he needed to go put something in his hotel room and suggested that they go by his room on their way to their meetings. When they arrived at DeChant's room, he told Basham to come in the room while he grabbed a few things. Basham stood by the window staring out while DeChant did whatever he needed to do. On their way out of the room, DeChant pointed to the bed and told Basham that she was welcome to sleep there that night. DeChant commented how "cool" it would be. He then said that he had a friend coming to stay with him at his hotel that night and that he was sure his friend would not mind if Basham was there.

J.    On March 25, 2008, Basham overheard DeChant ask the office assistant, Andrea Douglas, if her breasts were real or fake.

K.     On June 18, 2008, DeChant sent Basham an email accusing her of not being somewhere he thought she should be.   When DeChant realized he was mistaken, he sent Basham an email stating, "Just kidding!!!  I love you!"

L.     On Sunday, July 6, 2008, DeChant sent Basham an email asking if he could come to her home and meet with her.

39.     Some examples of specific incidents involving Fox include, but are not limited to, the following:

A.     On March 6, 2008, Fox attended a "welcome dinner" at Flemings restaurant for herself and Michael Swope.   Present at the dinner were Fox, DeChant, Don Curry, Patrick Schwind, Brian Hemauer, Basham, and Michael Swope, and their spouses or significant others.  After the dinner, DeChant told Fox that he had already warned his wife how pretty Fox was and that he even played a "joke" on his wife by showing her another Heather Fox on MySpace who looked like a "porn star." Additionally, DeChant told Fox that he already had a nickname for her, "Foxy," and that he liked her name because it sounded like a "porn star" name.

B.     On March 28, 2008, Fox came back to the office after meeting with her first customer by herself.  She was very excited to report her meeting to DeChant because when she made the appointment with her contact at Circle K, her contact indicated that he could only meet with her for a few minutes.   Once Fox arrived at the appointment, however, the customer was able to spend approximately 45 minutes with her.  DeChant commented to Fox, "yeah it's because he took one look at you!"

C.     On April 23 and 24, 2008, Fox and DeChant traveled to Salt Lake City, Utah, to meet with customers.  At the airport, they rented a Volvo station wagon. Once in the car, DeChant told Fox, "[n]ow we can pretend we are husband and wife." DeChant made numerous comments about his and Fox's "pretend kids" in the back seat.

D.     On  this  trip,  after  dinner,  and  after  DeChant  consumed approximately four drinks, DeChant and Fox were walking back to their hotel. As they were walking by a jewelry store, DeChant suggested to Fox that they go into the jewelry

store and "pretend" they were husband and wife.  Fox went inside the store with DeChant and once inside, DeChant said to Fox, in front of the sales person, "honey you can pick out any ring you want."  DeChant's behavior and comments made Fox extremely uncomfortable so she left the store immediately and began walking back to the hotel.  DeChant also left the store.  As they continued walking back to their hotel, DeChant purposely walked behind Fox.  When Fox asked DeChant why he was walking behind her, he said, "I like the view.  Hot blonde and hot body!"

E.     When Fox and DeChant arrived at the airport in Salt Lake City to fly back to Phoenix on April 24, 2008, DeChant asked one of the airline employees if Fox could get upgraded with him to First Class and told the employee that Fox was his wife.

F.     In spring 2008, the Phoenix office attended a baseball spring training game as a group.  Another female employee, Andrea Douglas, and Fox were sitting on either side of DeChant during the game.  During the game, DeChant sent a text message to all of the male employees present, which included Patrick Schwind, Don Curry, Michael Swope, and Brian Dole, asking whether Andrea Douglas' breasts were real or fake.  About a week after the game, Mr. Schwind approached Fox and told her about the text message and expressed how uncomfortable it had made him feel when DeChant sent this text message.  Basham also attended the game and was also told about the text message shortly after the game by several of the male employees.

G.     On May 22, 2008, Fox received an email from Erick Goldberg at PetSmart telling her that he was not interested in speaking with CareerBuilder and to not contact him anymore.  Fox called DeChant to talk to him about the email.  DeChant told Fox that she should send Mr. Goldberg a picture of herself and then there was no way he would turn down a meeting with her.  DeChant also suggested that Fox offer to "take [Mr. Goldberg] to a D-backs game or something" after sending Mr. Goldberg her picture.

/ / /

H.    In or around the middle of May, DeChant told Fox that a big reason he hired her was because her husband is a teacher and does not make very much money.

I.    Additionally, in or around the middle of May, Andrea Douglas told Fox that DeChant told her at the beginning of Fox's employment, "Heather will do well here.  She looks like you" (meaning Ms. Douglas).

J.    On May 15, 2008, DeChant and Fox drove in Fox's car to Tucson for two appointments.  On their way to the second appointment, DeChant was talking to someone on his cell phone.  DeChant told this individual that Fox was his "work girlfriend" and that if anything ever happened with his wife, he would be with Fox.

K.    Following their appointments, they stopped at a restaurant. DeChant and Fox both had a beer with their meals.  When the waitress asked Fox if she wanted another beer, DeChant responded, "you better give her one, then she might make out with me."

L.    During the drive back to Phoenix, Fox told DeChant that she needed to take a few days off from work the first week of July for some "post baby surgery."  DeChant responded, "that's okay.  My wife wants boobs too."  Additionally, DeChant said, "you know Andrea has them."  DeChant then said, "I'm not worried about you taking time off because I know you will get a return on your 'investment' with all the new business you will bring in."

M.    On June 20, 2008, DeChant asked several of Fox's co-workers, in Fox's presence, "[d]id you know that Heather is pregnant with my child?"

N.    On September 30, 2008, Fox met with DeChant.  During this meeting, DeChant told Fox that "he wished he had Heather Fox when she was in her 20's, before kids."  DeChant also told Fox that he told his wife, "I'm sure Heather would love to be you and get to stay home.  Instead, her husband is a teacher so she has to work and leave her kids."

40.    DeChant's actions and comments of a sexual nature were offensive and unwelcome to Plaintiffs.

41.    Plaintiffs were both extremely distressed by DeChant's repeated inappropriate behavior.  However, they were afraid to report the behavior because (1) they were new employees; (2) DeChant was their supervisor and could influence whether they were allowed to keep their jobs; and (3) they were afraid they would lose their jobs if they complained.

42.    On or around April 8, 2008, an HR representative from CareerBuilder's corporate office in Chicago, Illinois, Stacey Swanson, came to the Phoenix office to introduce herself to employees in Phoenix.  She met with the sales staff in a group. During this meeting, Swanson explained to employees, among other things, how they could report incidents of sexual harassment or conflicts with co-workers.  Basham asked Swanson during the meeting if employee complaints of sexual harassment were confidential.  Swanson responded that they were not.

43.    Due to Swanson's response, Basham was afraid to say anything to Swanson or anyone else about DeChant's behavior because they would tell DeChant, her supervisor and the person with the authority to terminate her, that she had complained.

44.    Following the meeting, Fox approached Basham and asked if she had been sexually harassed.  Basham responded, yes.  Fox told Basham about DeChant's sexually harassing behavior toward her but that she did not feel she could go to HR because of Swanson's response to Basham's question.  Prior to this, Basham was unaware that Fox and other female employees in the office were being subjected to sexual harassment by DeChant because Basham did not work in the office on a daily basis.

45.    Following Basham's question to Swanson, Basham's work environment became even more uncomfortable than it previously had been.

46.    Making her work environment even worse was the knowledge that she could not confidentially complain to human resources regarding her treatment.

47.    DeChant's behavior caused adverse affects on Basham.  It increasingly became more challenging for Basham to work with DeChant knowing that DeChant would continue his unwelcome behavior.  Basham also began feeling stressed, nervous,

and anxious having to work with DeChant and especially the requirement to travel with him. Basham tried to avoid DeChant as much as possible due to his sexually harassing behavior. However, Basham was still required to interact with DeChant because he was her supervisor.

48. DeChant's unwelcome sexual comments and solicitations also began to affect Basham's work performance and on July 1, 2008, Basham was placed on a Performance Improvement Plan (PIP) by DeChant.

49. According to the PIP, Basham needed to improve her performance within the next 30 to 60 days, she needed to increase her revenue growth by $6,000 in July and $8,000 in August, she had to begin working from the office every day she was not traveling, she needed to make a minimum of 200 telephone calls and have eight in-person appointments (four of which had to be first time meetings with new contacts to discuss new business opportunities) per week, she needed to complete two new proposals (for new business) per week, and she was to meet with DeChant on a weekly basis to discuss her progress.

50. Although the PIP gave Basham specific goals to achieve, DeChant never met with Basham or followed up with her regarding her progress on the PIP.

51. The goals and activities Basham was given to perform as part of her PIP were much more stringent than other account executives had to perform, e.g. the requirement to propose a minimum of two new proposals per week. One to two proposals per month was typical for account executives.

52. Although Basham's performance was affected by DeChant's sexual harassment, upon information and belief, her performance at this time was still comparable to other national account executives at CareerBuilder who were not placed on Performance Improvement Plans. In fact, during her employment, Basham received five awards for being the Top National Account Executive in the Phoenix office. The first award was for August 2007 (her first month of work), September and November 2007, and January and March 2008. Additionally, in an April 1, 2008 email to Andrew

Streiter ("Streiter"), Area Vice President, from DeChant, DeChant states: "Jamie is the single hardest-working person in our office, bar none.  She makes more calls, runs more appointments, and proposes more business than anyone, and I have documented that." Basham also received a $15,000 bonus during this time due to her performance. Employees who did not perform well did not receive $15,000 bonuses.

53.    Other account executives who were not meeting their quotas were not similarly disciplined.  For example, Don Curry was promoted from a major account executive position to a national account executive position; Patrick Schwind was promoted from a national account executive position to a sales manager position; Kevin Churkas was allowed to transfer to another state; and Brian Dole was allowed to transfer to another department within the Company.

54.    On or around July 1, 2008, after placing Basham on the PIP ostensibly to improve her performance, DeChant promised Basham a new account.  DeChant told Basham that he wanted to give her the Banner Health account because he had noticed that she did not have any healthcare accounts, and healthcare accounts were usually good revenue accounts.  Several days later, on July 7, 2008, Basham learned that the Banner Health account had been given to a male co-worker instead.  DeChant never discussed with Basham giving this account to another employee.  Basham emailed DeChant on July 7, 2008 and asked him why the account had been given to her male co-worker.  DeChant never responded to Ms. Basham's email.

55.    Following this incident, Basham made the decision to report DeChant's sexually harassing behavior to management.  On or about July 8, 2008, Basham complained to Streiter, Area Vice President, about several specific instances of sexually related comments and the ongoing nature of the sexual harassment and inappropriate remarks she was being subjected to by DeChant.

56.    That same day (July 8, 2008), Streiter contacted Fox.  Streiter began by telling Fox not to worry; DeChant would not get fired over what she told Streiter.  Based on this, Fox knew that there was no point in telling Streiter about DeChant's sexually

harassing behavior because nothing was going to be done about it.  Additionally, Fox was afraid to complain because she was still going to be required to report to DeChant and she could not afford to lose her job because she was the main provider for her family.  Streiter then asked Fox if she had ever felt uncomfortable around DeChant.  Fox responded that she had.  Streiter asked Fox for an example, but Fox initially refused, fearing retaliation.  Streiter persisted in asking Fox for some examples.  Fox finally told Streiter about the March 28, 2008 and May 22, 2008 incidents described in paragraphs 39(B) and (G) above.

57.    On July 9, 2008, Streiter sent Basham an email stating he would be speaking with DeChant the following day and "everything [would] be taken care of."

58.    On July 11, 2008, Basham also complained to Stacey Swanson in Human Resources about DeChant.

59.    Following Basham and Fox's rejections of DeChant's solicitations and their complaints to management and human resources about sexual harassment and discrimination, they were retaliated against.

60.    Some examples of specific incidents of retaliation involving Basham include, but are not limited to, the following:

A.    Between July and October 2008, Basham made numerous telephone calls to Streiter to complain about DeChant's behavior.  During these telephone conversations, Streiter repeatedly assured Basham that she had done nothing wrong, that she had done the right thing by complaining to human resources, that CareerBuilder was taking her complaints very serious, and that CareerBuilder was going to "fix" this.  Streiter also repeatedly told Basham that she did not need to work in the office, that she could work from home, that she did not have to go to DeChant for anything if she was not comfortable doing so, and that she did not have to travel with DeChant.  Basham requested from Streiter that she be allowed to report to another sales manager.  Because Basham was working from home and handled accounts all over the United States, she could easily report to another sales manager in another state.  Streiter refused to assign

Basham to a different sales manager.  Streiter continued to assure Basham that CareerBuilder was working on correcting the situation.

B.     On July 22, 2008, DeChant informed Basham that he would be traveling to Las Vegas to attend her appointment at the MGM Hotel (even though Streiter had previously told Basham that she did not have to travel with DeChant). Basham immediately called Streiter and asked him if he could attend the meeting with this client with her instead of DeChant.  Streiter responded that DeChant was attending the meeting.  Basham became very anxious, sick, and stressed by Streiter's response. Basham was required to travel and attend this meeting with DeChant.

C.     On July 30, 2008, Streiter emailed Basham asking "How is everything?"  Basham telephoned Streiter and again complained that she was very uncomfortable working with DeChant.  Basham also complained that she was physically ill from her work environment and that she did not know how much longer she could continue to work like this.  Streiter told Basham to "hang in there" and that he was going to come to Phoenix soon and "make things right."  Additionally, Streiter asked Basham to please not leave, "we need you."  Streiter admitted to Basham that he knew CareerBuilder needed to correct the situation and said they were working on it.

D.     On September 16, 2008, Streiter finally came to Phoenix.  He was in the office for two days meeting with employees and others.  Basham was given only 20 minutes to talk to Streiter during those two days.  During the meeting, Basham again complained to Streiter that she was very uncomfortable with her work environment.  She complained to Streiter that DeChant was not treating her fairly and purposely trying to make her life difficult.  Basham gave Streiter several examples, such as DeChant's rescission of her allowance to work from home and his directive that she had to be in the office from 8:00 a.m. to 5:00 p.m. every day, saying it was a new company policy. Basham told Streiter that she was sure the Company could make some sort of exception for an employee who had been sexually harassed by her boss when the boss was still there.  Basham repeatedly told Streiter during this meeting that she was not comfortable

being around DeChant.  Streiter again reassured Basham that everything would be taken care of.  Streiter told Basham that these kinds of things took time and that everyone would be okay.  Streiter told Basham that she did not need to be in the office and could continue to work from home and that she would not have to travel with DeChant.  Streiter again reassured Basham that he was "fixing" the situation.

E.     The day after Basham's meeting with Streiter, September 17, 2008, DeChant again told Basham that she needed to be in the office every day from 8:00 a.m. to 5:00 p.m.

F.     On September 30, 2008, without explanation or reason, DeChant informed Basham that he was taking away her Boyd Gaming account and giving it to Fox and that he was giving her Fox's PetSmart account.  Basham felt like DeChant was punishing her and Fox for their complaints because Boyd Gaming was happy with Basham as their account executive.  DeChant's actions also negatively impacted Basham and Fox's sales numbers.

G.     Also on this same date, Basham had a one-on-one meeting with DeChant.  Basham wore a pair of business slacks and a sleeveless business shirt to the meeting.  When Basham sat down, DeChant put his hands up and said, "skin, skin, skin.  Wow, I see too much skin."

H.     On October 10, 2008, while Basham was in the office, Andrea Douglas, the office assistant, informed Basham that DeChant had recently purchased or leased covered parking spots in the basement of their building's parking garage for the sales staff.  Although Basham had been at CareerBuilder longer than all but one other sales person, she was the only one not to receive a covered parking spot.

I.     This same day, DeChant again told Basham that she was not spending enough time in the office, that she was not working with him and using him for his experience as she was supposed to, and that she needed to be in the office every day from 8:00 a.m. to 5:00 p.m. unless she was traveling.  Basham told DeChant that Streiter had told her on numerous occasions that she did not have to be in the office and that she

did not have to go to him (DeChant) for anything if she was not comfortable doing so. DeChant told Basham that if she wanted to keep her job she needed to follow his orders. He also told Basham that if she had a problem with any of his orders she could call Streiter. Basham became very upset and left the office in tears.

J.    After leaving the office, Basham called Streiter. Basham was crying and obviously very upset on the telephone. She told Streiter that she did not understand why she was still working for DeChant and why things had not changed in the office as he had been promising her for months. Basham asked Streiter why he was continually telling her one thing and then DeChant would tell her the exact opposite. Basham asked Streiter why DeChant was so adamant that she was not doing her job when prior to her complaints she had always performed her job acceptably and had received five (5) Top National Account Executive monthly awards. Basham told Streiter that it was obvious that there was no way DeChant was going to manage her fairly because of her complaints. Streiter responded that he was "sick of getting these phone calls" and that Basham needed "to get over it." Streiter further told Basham that DeChant was not going anywhere and that maybe she needed to find another place to work if she was not comfortable working with DeChant. Basham asked Streiter how he could make that decision when so many people in the Phoenix office had complained about DeChant. Streiter reiterated that he was sick of hearing about it. Basham told Streiter that she was going to take the next week off of work because she could not handle the stress of continuing to work with DeChant.

K.    On October 16, 2008, while Basham was off of work on leave, DeChant emailed her requesting that she set up appointments for them (Basham and DeChant) to visit Basham's customers in Las Vegas. Basham called Streiter and left a message asking why DeChant was asking to travel with her when she had been told by him (Streiter) that she would not have to travel with DeChant. She did not receive a response to her message.

/ / /

-18-

L.      DeChant continued to email Basham numerous times while she was off work on leave.

M.      On October 22, 2008, Basham received an email regarding an organizational change removing Streiter as the Area Vice President as of November 1, 2008. The new Area Vice President was Hunter Arnold ("Arnold").

N.      On October 27, 2008, DeChant sent an email to the new Vice President, Arnold, entitled "October Scoreboard." This email detailed each sales person's activity and results of the month. This spreadsheet listed everyone except Basham.

O.      That same day, October 27, 2008, Basham received a Final Warning: Performance Improvement Plan from DeChant. The goals and activities Basham was given to perform in this Final Warning: Performance Improvement Plan were even more egregious and stringent than those in the July 1, 2008 PIP and harsher than other sales representatives had to perform, e.g., the requirement to propose six new deals and close two new deals per week, even though two proposals per month was typical for sales representatives. The decline in Basham's job performance was due to the requirement to continue working with DeChant, his sexual harassment, the Company covering for DeChant, and the retaliation Basham faced because she complained.

P.      The Final Warning: Performance Improvement Plan from DeChant also required that "[b]y this Friday Close of Business, you must deliver all of your Outlook contacts, spreadsheets, and business cards to Andrea Douglas so we can enter them in Pivotal" and "[e]nter all meetings from September and October into Pivotal," suggesting to Basham that DeChant was preparing to fire her.

61.     Due to intolerable working conditions, Basham went on medical leave on November 4, 2008.

62.     On December 2, 2008, Basham's request for short-term disability was initially denied.

/ / /

63.     Basham was terminated the following day, December 3, 2008, allegedly for "poor performance."

64.     On December 10, 2008, the insurer's agent, Matrix Absence Management, Inc., rescinded its decision and approved Basham's claim for disability benefits under CareerBuilder's Short-Term Disability Plan.  CareerBuilder, however, did not rescind its decision to terminate Basham's employment.

65.     Some examples of specific incidents of retaliation involving Fox include, but are not limited to, the following:

A.     Approximately a week after Basham's complaints to Streiter and Swanson, and after Streiter allegedly talked to DeChant about his sexually harassing behavior, the Phoenix office had an off-site get together for Fox's birthday.  DeChant openly told numerous people at the party that he was going to be the next CEO of CareerBuilder.  DeChant's statement about his employment security at CareerBuilder, coupled with Streiter's statement on July 8, 2008 assuring Fox that DeChant would not be fired, confirmed in Fox's mind the futility of complaining about DeChant.

B.     On July 16, 2008, following Basham's complaint and Fox's conversation with Streiter, DeChant and Fox traveled to Salt Lake City, Utah, to meet with clients.  During the trip, DeChant commented several times that he was afraid to say anything to Fox because he did not want her to go to human resources (as Basham and another female employee supervised by DeChant, Jeanne Serene, had done).

C.     On July 18, 2008, during a conference call with his sales group, DeChant publicly apologized for his "inappropriate behavior" and told the sales group "this was a great learning experience."  Following this conference call, DeChant called Fox on her cell phone and apologized for his inappropriate behavior towards her and promised to change his behavior.  DeChant did not personally called Basham.  However, DeChant continued his sexually harassing behavior toward Plaintiffs and other female employees.

/ / /

D.     On or around August 27, 2008, while Fox was on vacation out-of-state, DeChant called her several times on her cell phone allegedly to give Fox her performance review and to discuss taking away some of Fox's current accounts. DeChant told Fox he was taking away some of her accounts because she allegedly had not been traveling enough. DeChant further went on to say that he knew it was hard for Fox to travel because she was a mom, but he did not want her to fall into the same trap as the other mom's in the office. Prior to this, Fox had never been warned that she was not traveling enough. In fact, Fox had won a Top Field Rep Award (for the Arizona region) on July 8, 2008 for having the most out-of-town meetings.

E.     On August 29, 2008, while Fox was still on vacation out-of-state, DeChant called Fox and told her that he needed her to make an immediate decision on which accounts she wanted to take over. DeChant said he wanted to give Fox the Honeywell and PF Changs accounts, but first he needed Fox to commit to traveling more. Fox agreed she would take over the Honeywell and PF Chang accounts. After agreeing to take over these accounts, DeChant told Fox that he was taking away her Intermountain Healthcare, which DeChant claimed was Fox's "top opportunity", and Alsco accounts. At this time, Fox had previously met with the Vice-President of Human Resources at Alsco regarding CareerBuilder's services and there was a pending $60,000 proposal with CareerBuilder.

F.     During this telephone call, DeChant also promised Fox that there would be new accounts available by October 1, 2008, so if she could "hang on tight" she would receive more accounts in Las Vegas. At this time, only Basham had accounts in Las Vegas indicating DeChant's plan to get rid of Basham by October 1, 2008. DeChant also told Fox that with her "looks and personality [she] would excel in Vegas."

G.     On or around September 10, 2008, Fox and a male co-worker, Michael Swope, went to lunch together. During lunch, Mr. Swope told Fox that he thought Honeywell was one of the best accounts in the office and he really wanted it.

/ / /

H.     On or around September 13, 2008, DeChant emailed Fox stating that he wanted to help her find a better work/life balance and that he wanted her to consider taking a major account executive (MAE) sales position. This was a lower, less prestigious position than her current national account executive (NAE) sales position. DeChant told Fox that he could give her accounts where she would not have to travel as much and could be home with her kids more. During the week following this email, DeChant sent Fox several more emails with different options on the accounts Fox could keep as an MAE.

I.     On September 22, 2008, DeChant asked Fox if she had yet sold the DMA program to Honeywell, specifically Donna Smith in the Maryland office, as she had 300 job postings that she had not used and the DMA program would help Fox make her numbers for the quarter. Following this conversation, Fox set up conference calls with Donna Smith in Honeywell's Maryland office and with Honeywell's New Jersey office.

J.     On September 25, 2008, Fox had a conference call with Donna Smith from Honeywell. During the call, Fox fully explained to Ms. Smith the benefits of CareerBuilder's Relocation Program. Fox explained to Ms. Smith that with the DMA program, CareerBuilder could advertise these positions regionally. Ms. Smith agreed to this program and promised to send Fox the job descriptions for the positions for which Honeywell paid a partial relocation fee. Following Fox's telephone conversation with Ms. Smith, Fox talked to Michael Swope and expressed her excitement on this sale, which would be finalized before the end of the month. Mr. Swope told Fox that he had already been calling Honeywell and that the account was going to be given to him on October 1, 2008.

K.     Following Fox's conversation with Michael Swope, Fox met with DeChant to tell him about her sale. When Fox asked DeChant why Mr. Swope was calling her account, DeChant told Fox that Mr. Swope was able to travel more and Honeywell would better suit him. This was approximately two-and-a-half months after

Fox received the Top Field Representative Award (for the Arizona region) for having the most out of town meetings.

L.     Upon information and belief, Michael Swope was calling Honeywell with DeChant's knowledge and approval at least since September 10, 2008 and at the time DeChant was asking Fox if she had talked to Honeywell about the DMA program.

M.     On September 29, 2008, DeChant emailed Fox telling her to "do everything possible to get the PetSmart deal in by today or tomorrow." That same day, during their one-on-one meeting, DeChant told Fox that if she became an MAE she would need to travel six to eight days per month and if she stayed an NAE she would have to travel eight to ten days per month. DeChant expressed to Fox that he wanted her to become an MAE and take away all of her large accounts.

N.     On September 30, 2008, Fox emailed DeChant to request a meeting with him and Streiter to discuss DeChant's expectations of her and the accounts he was giving her because Fox was concerned DeChant wanted to give her eleven small accounts and the other MAE's each had 25-41 accounts. A meeting was set up for later that morning.

O.     Also on this date, Fox telephoned Stacey Swanson in HR and reported that she felt that DeChant was trying to make her fail and that he was moving her accounts that were ready to close to other individuals. Fox also complained to Swanson that DeChant and CareerBuilder's expectations of travel requirements had not been properly discussed with her at the time of her hire.

P.     After her telephone conversation with Swanson, Fox participated in the telephone conference call with DeChant and Streiter. Streiter told Fox and DeChant that they needed to meet together in person to resolve Fox's questions and then report back to him what happened. Fox met with DeChant following this telephone conference, which resulted in the following: (1) Fox was moved to an MAE position effective October 1, 2008 and would relinquish her three most travel-heavy NAE

accounts, which were Honeywell, PetSmart (which was given to Basham), and PF Chang's; (2) Fox's new MAE accounts would include a total of 13 accounts, including USAirways, Circle K, Best Western, Boyd Gaming (which had previously been Basham's account), and multiple Tucson accounts; (3) Fox would begin working a flexible 40 hour schedule and would be in the office or traveling four out of five days each week; (4) Fox would travel a minimum of four days per month and would travel more as business dictated; (5) Fox would meet with a minimum of 25 people each month; and (5) this arrangement was contingent on Fox continuing to consistently grow her business by quota and propose new business each month.

Q. Fox did not agree with the removal of her Honeywell, PetSmart, and PF Chang accounts. The Honeywell and PF Chang accounts were given to a male co-worker of Fox, Michael Swope.

R. Fox also was not allowed to follow up with Donna Smith at Honeywell after September 30, 2008 regarding the DMA Program she sold Ms. Smith due to the transfer of the Honeywell account to Mr. Swope.

S. DeChant moved Fox's PetSmart account to Basham and moved Basham's Boyd Gaming account to Fox. Neither Basham nor Fox wanted to make this trade because they both had good relationships with their own accounts. When Fox's contact at PetSmart learned that Fox was no longer her sales rep, she asked Fox to have her manager call because she was considering cancelling her contract because she was so upset by the change. When Fox relayed the customer's concerns to DeChant, DeChant responded that he was willing to walk away from PetSmart's business rather than to give the account back to Fox. Additionally, on November 4, 2008, Robert Gerst, Vice President Human Resources of Boyd Gaming, emailed DeChant with his concerns regarding the removal of Basham as Boyd Gaming's account executive.

T. Despite moving Fox to a major account executive position, assigning her small accounts, and removing her large accounts, DeChant continued to pressure Fox that she needed to travel more. Fox was moved to a major account

executive position on October 1, 2008, and she traveled seven days during the month of October, which was more than DeChant had agreed she was required to travel.

U.     As a result of her move to a major account executive position, Fox's commission plan and earning capacity were also significantly lowered, especially since many of her accounts were taken away from her. Her quarterly bonus potential was also less. Additionally, the accounts that were assigned to Fox by DeChant had historically not been high potential accounts. National Account and Major Account Executives were paid commissions based on the growth of their assigned accounts. Fox was assigned accounts for small companies that typically did not grow because the companies did not grow. Therefore, Fox was able to sell these companies all the product and services they could use in the first month or so of obtaining the account, but she was unable to grow them from there.

V.     On November 10, 2008, Fox was scheduled to meet with Hunter Arnold, the new area vice president, who was visiting the Phoenix office to meet employees. Fox understood that Arnold was going to be going over new accounts that were being assigned to her. As the meeting started, Arnold told Fox that he wanted to get Stacey Swanson on the telephone. Arnold said he had received a customer complaint on Fox and asked Fox to explain what she sold to Honeywell. Fox briefly explained the DMA program she had sold to Honeywell and then told Arnold that as soon as the jobs were posted on September 30, 2008, DeChant switched the account from Fox to Mr. Swope (on October 1, 2008) before Fox could follow up with the customer. Arnold told Fox that allegedly the customer did not know that they were using all 300 postings at one time. This confused Fox because she had explained to the customer the details of the program. Arnold said that CareerBuilder was going to have to take the commission for this sale out of Fox's commissions for the next quarter. Fox was shocked by Arnold's statement because this was the first she had heard that Honeywell had complained about the DMA program and because she had never heard of an account executive having commissions withheld from their pay due to a customer

complaint.  In fact, DeChant told account executives on several occasions that they were not doing their jobs unless were getting customer complaints.  This was Fox's first alleged customer complaint.  Arnold told Fox that he understood that customers exaggerate and that he knew that Honeywell probably obtained a few hires out of the deal, but that Ms. Smith probably just got into trouble and had to cover her tracks.  Fox was not given an opportunity to correct any misunderstanding with Honeywell.

W.      During this meeting, Arnold also told Fox that he was going to give her some new accounts because of how she was being treated by DeChant (regarding the removal of Fox's accounts) and because he had been told by DeChant that she was one of the top four producers in the office.  Arnold also asked Fox about the office environment at CareerBuilder.  Hunter specifically asked Fox if she had experienced any sexual harassment at CareerBuilder.  Fox told Arnold that she had and that all of the female employees in the Phoenix office had been working in a hostile work environment.  Fox also complained to Arnold that she felt as though DeChant was trying to make her fail by switching her accounts around.  Fox specifically told Arnold about the Honeywell account and how DeChant had taken the account away from her after telling her to sell it, and about her PetSmart account and how DeChant had taken it away after she closed a sale to PetSmart.  Arnold covered his ears with his hands and said, "I can't hear any more."  Fox told Arnold that she was very excited to start new, with DeChant out of the office.  Arnold then attempted to question Fox about Andrea Douglas and Basham who were both out of the office on leaves of absence.

X.      Following this meeting, Fox did not have any further communication with Arnold until November 19, 2008.  On November 19, 2008, Arnold sent Fox an email requesting to schedule a conference call with her.  The conference call was scheduled for 1:00 p.m. that day.  When Fox received Arnold's telephone call, Stacey Swanson was also on the line.  Arnold started out the conversation by saying, "[b]ased on the Honeywell situation, we have to separate employment."  Fox was shocked and asked if CareerBuilder had any probationary steps for employees prior to

terminating their employment because termination seemed so extreme.  Fox explained that it was never her intent to mislead the customer.  Swanson responded that it did not matter what Fox's intent was, it only mattered that the customer was upset.  During this telephone conference, Fox was extremely upset and emotional.  Fox repeatedly tried to explain what had occurred, that DeChant had taken the account away before she could finish the deal, and that she was never able to follow through with her sale.  Fox also told Hunter and Swanson that she had successfully sold this program several times before.  Hunter did not respond to Fox, but told her that her commissions and benefits would end effective immediately.

Y.    About an hour after this conference call, Fox called Rosemary Haefner, the Vice President of HR, and asked if there was an appeals process for terminations of employment.  Ms. Haefner said that she would speak to Swanson and get back to Fox the next day (Thursday).  Fox asked Ms. Haefner if she could explain her side of what had occurred regarding the Honeywell account.  Ms. Haefner said she would get that information from Swanson.  Approximately 20 minutes later, Fox received a telephone call from Swanson.  Swanson told Fox that the decision to terminate her was final and that there was nothing more that could be done.  Ms. Haefner never called Fox back.

66.    Other employees received customer complaints, but they were not terminated.  In fact, whenever account executives in the Phoenix office received customer complaints, DeChant viewed them as good things because to him customer complaints meant that account executives were being aggressive and doing what needed to be done.  For example:

(A)    DeChant told account executives during a sales meeting that the best national account executive in the company, a male NAE in San Francisco, California, had every account ask to have him removed from the account.  This national account executive has not been terminated.

/ / /

(B)   U-Haul complained to CareerBuilder that their national account executive, Kevin Cherkes, was bypassing the person he was supposed to be working with at U-Haul and threatened that they would quit using CareerBuilder if Mr. Cherkes was not removed as their national account executive.  DeChant switched U-Haul's account to another national account executive, Patrick Schwind.  Mr. Cherkes was not terminated for his behavior.

(C)   Additionally, Apollo Group complained to CareerBuilder that Kevin Cherkes was contacting individuals he was not supposed to be contacting, among other things.  Apollo Group also threatened to stop using CareerBuilder because of Mr. Cherkes' behavior.  Apollo Group was CareerBuilder's largest account in its Arizona office.  DeChant  switched Apollo Group to another national account executive, Patrick Schwind.  Again, Mr. Cherkes was not terminated for his behavior.

(D)   In order to make her quota for the month, a national account executive, Ramona, posted several job listings from Zions Bank without Zions Bank's knowledge or consent.  When the bank learned what Ramona had done, they were furious and stopped using CareerBuilder.  The Zions Bank account was moved to Basham.  Ramona was not terminated for her behavior.

(E)   Brian Dole, a major account executive, made one of his accounts, Banner Healthcare, so mad by going around Banner Healthcare's main human resources contact, among other things, that they asked CareerBuilder to remove him as their account executive. DeChant switched the Banner Healthcare account to Brian Hemauer. Mr. Dole was not terminated for his behavior.

(F)   Brian Dole also lost two other accounts.  DeChant switched these accounts to other national account executives.  Mr. Dole was not terminated for his behavior.  In fact, after receiving customer complaints regarding him and losing a few accounts, Brian Dole was later promoted by CareerBuilder to a position as a Director of Sales of CareerBuilder's newspaper division.

/ / /

(G)     DeChant fabricated information for a marketing presentation he and Fox presented to US Airways' Marketing Department.  DeChant fabricated information because he was not able to get approved what he actually wanted to provide the customer.  During this meeting, DeChant told representatives of US Airways that CareerBuilder could target individuals based on age, occupation, income level, how often they traveled, and if they were looking to relocate for a job.  This was false information, and DeChant knew it was false.  CareerBuilder can only target individuals based on age, income, gender, and geographical location.  DeChant was not terminated for his behavior.

(H)     DeChant fabricated information for marketing presentations given to Tucson Medical Center, University Medical Center, and Intermountain Healthcare about CareerBuilder's nurse relocation program.  DeChant used this information for five different presentations given to Intermountain Healthcare.  DeChant stated that CareerBuilder had conducted a sourcing analysis to obtain its information, which is not true.  CareerBuilder does not perform sourcing analyses.  DeChant also stated during these presentations that CareerBuilder had information on the exact time nurses in specific areas used the internet to search for jobs and gave specific examples, such as nurses in Boston searched the internet at 10:00 a.m. and nurses in Dallas searched the internet at 4:00 p.m.   DeChant stated that CareerBuilder specifically targeted prospective employees in these areas during this time, which was not true.  CareerBuilder has no way of gathering this type of data.  DeChant sent this presentation to every sales manager at CareerBuilder to use.  DeChant was not terminated for giving customers false information.

(I)     On May 21, 2008, Basham discovered that DeChant told one of her customers, Swift Transportation, via email that a contract CareerBuilder received from Swift had been altered.  DeChant claimed that he had verified with CareerBuilder's Information Technology team that the contract had been altered.  When Basham questioned DeChant about the contract, he admitted that he had made this story up, that

the contract had not been altered, CareerBuilder did not have an Information Technology team, and that he had lied because a mistake had been made by CareerBuilder which was going to cost CareerBuilder money. Following this incident, Patrick Schwind, national account executive, pretended to be CareerBuilder's new sales manager in place of DeChant, and told Swift that DeChant had been terminated due to this incident. DeChant was never terminated.

67.    According to DeChant, customer complaints were something to be prized. DeChant repeatedly told account executives that in most CareerBuilder offices, they kept track of how many customer complaints each sales representative received and the sales representative with the most customer complaints at the end of a period of time won a prize.

68.    During Fox's performance reviews with DeChant, most of his negative feedback regarding Fox's performance was that Fox was "too nice" and that she was "afraid to piss anybody off." DeChant repeatedly told Fox that she was not doing her job unless she received customer complaints.

69.    Plaintiffs timely filed this lawsuit.

## COUNT I

### (Violation of the Family and Medical Leave Act)

70.    All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

71.    The Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, allows an eligible employee to take up to twelve weeks of unpaid leave in any 12 month period for various purposes, including a serious health condition that makes the employee unable to perform one or more of the essential functions of his or her job.

72.    Basham was an eligible employee and Defendants were covered employers under the FMLA.

73.    Basham suffered from a serious health condition as defined in the FMLA.

/ / /

74.   Basham took qualified FMLA leave from her job with Defendants because of her serious health condition.

75.   Basham was terminated in whole or in part because she availed herself of qualified FMLA leave.

76.   Defendants violated the FMLA by (1) interfering with Basham's FMLA rights or (2) retaliating against Basham for exercising FMLA leave when Defendants involuntarily terminated her employment after she took or while she was taking qualified FMLA leave.

77.   As provided for under the FMLA, Basham is entitled to collect liquidated damages equal to the sum of her lost compensation, wages, and benefits.

78.   As a result of Defendants' violations of the FMLA, Basham is entitled to collect wages, employment, and pension benefits denied or lost, interest on this amount, liquidated damages equal to the lost compensation, wages, and benefits, including her back pay damages, compensatory damages, and her reasonable attorneys' fees and costs. Basham is also entitled to reinstatement or in lieu thereof front pay and other appropriate equitable relief, as well as all other remedies available under 29 U.S.C. § 2601, *et seq.*

## COUNT II

### (Intentional Infliction of Emotional Distress)

79.   All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

80.   The actions described in this Complaint committed by the Defendants in this matter constitute extreme and outrageous conduct under Arizona law and were either intended to cause Plaintiffs severe emotional distress or were so recklessly indifferent to the near certainty that the acts described in this Complaint would cause Plaintiffs severe emotional distress that they can be considered intentional.

81.   Plaintiffs suffered severe and debilitating emotional distress, humiliation, and degradation as a result of the acts undertaken by Defendants, entitling them to recover damages.

82.   Because Defendants' actions were undertaken with a conscious indifference to the near certainty that Plaintiffs would be damaged by their conduct, Plaintiffs are entitled to collect punitive damages from Defendants.

## COUNT III

**(Intentional Interference With Contract – Mark DeChant, Andrew Streiter, Hunter Arnold, and Stacey Swanson)**

83.   All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

84.   Plaintiffs consistently and acceptably performed all of their duties at Defendant CareerBuilder.

85.   An employment contractual relationship existed between Plaintiffs and Defendant CareerBuilder.

86.   Defendants DeChant, Streiter, Arnold, and Swanson knew of Plaintiffs' employment contractual relationship with Defendant CareerBuilder.

87.   Following Plaintiffs' complaints of DeChant's sexually harassing behavior as in this Complaint, Defendants DeChant, Streiter, Arnold, and Swanson vindictively and intentionally interfered with Plaintiffs' employment contracts by terminating Plaintiffs' employment or influencing the termination of their employment.

88.   Plaintiffs were in fact terminated in violation of the law, and Defendants DeChant's, Streiter's, Arnold's, and Swanson's motivations for terminating Plaintiffs' employment was improper and wrongful as to motive and means.

89.   Plaintiffs have suffered damages as a result of the intentional interference with Plaintiffs' employment contract with Defendant CareerBuilders.

90.   Plaintiffs have suffered damages and are entitled to recover against DeChant, Streiter, Arnold, and Swanson loss of income and benefits under Plaintiffs' employment contracts with Defendant CareerBuilder, harm to reputation, pain and suffering, emotional distress, and punitive damages.

/ / /

WHEREFORE, Plaintiffs request that this court enter judgment in their favor and against the Defendants as follows:

A.      Declare that the employment practices complained of in this Complaint are unlawful and that they violate 29 U.S.C. § 2601, *et seq.*;

B.      Order Defendant CareerBuilder to make Plaintiffs whole by reinstating them with full back pay, bridged seniority, and reimbursement for all loss of pension, retirement, insurance, Social Security and other monetary and non-monetary benefits, or, alternatively deny reinstatement because of workplace hostility and other aggravating circumstances and order Defendant to pay Plaintiffs back and front pay and reimbursement for all loss of pension, retirement, insurance, Social Security, and other monetary and non-monetary benefits, all amounts to be proven at trial;

C.      Order Defendant CareerBuilder to make Plaintiff Basham whole, pursuant to 29 U.S.C. § 2601, *et seq.*;

D.      Order Defendants to pay Plaintiffs' actual damages in an amount to be proven at trial;

E.      Order Defendants to pay Plaintiffs general and compensatory damages for their economic losses, pain and suffering, emotional distress, harm to reputation and loss of earning capacity, and all special damages or financial losses that Plaintiffs have suffered in an amount to be proven at trial;

F.      For loss of fringe benefits in an amount that will be proven at trial;

G.      For additional damages to compensate for the taxation of Plaintiffs' economic damages;

H.      For all relief available under the FMLA on Basham's FMLA claim;

I.      For liquidated damages on Plaintiff Basham's FMLA claim;

J.      Award Plaintiffs prejudgment interest from the date each claim for damages was liquidated;

K.   Award Plaintiffs prejudgment interest on all liquidated sums and interest on all sums awarded in judgment at the highest legal rate allowable from the date of judgment until paid;

L.   Award Plaintiffs interest on all sums awarded in judgment at the highest legal rate allowable from the date of judgment until paid;

M.   Order Defendants to pay Plaintiffs' court costs, expenses, and reasonable attorneys' fees in connection with this action, as provided in 29 U.S.C. § 2601, *et seq.*;

N.   Order Defendants to pay Plaintiffs punitive damages sufficient to punish Defendants for their malicious actions and to deter such conduct in the future;

O.   For Plaintiffs' continuing costs in this matter;

P.   Retain jurisdiction over this action to ensure full compliance with the Court's orders and require Defendants to file such reports as the Court deems necessary to evaluate such compliance; and

Q.   For such other and further relief as this court deems just and proper under the circumstances.

**DATED** this 18th day of November, 2010.

**JACKSON WHITE**

By:   Michael R. Pruitt, SBN 011792
40 North Center Street, Suite 200
Mesa, Arizona   85201
*Attorneys for Plaintiff*

/ / /

/ / /

/ / /

/ / /

-34-

**ORIGINAL** of the foregoing filed with
the Clerk of the Court this 18th day of
November, 2010.

By: _____

F:\DEF\Fox, Heather\Pleadings\Complaint.doc

COPY

NOV 1 8 2010

MICHAEL K. JEANES, CLERK
A. JAMES
DEPUTY CLERK

1

**JACKSONWHITE**
  ATTORNEYS AT LAW
  *A Professional Corporation*

2

3   40 North Center Street, Suite 200
    Mesa, Arizona   85201
4   Telephone No.:      (480) 464-1111
    Facsimile No.:      (480) 464-5692
5   Email:      centraldocket@jacksonwhitelaw.com
    *Attorneys for Plaintiffs*
6   By:   Michael R. Pruitt, SBN 011792
          Email:      mpruitt@jacksonwhitelaw.com
7

8

9          **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

10            **IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| 11  Jamie L. Basham, a single woman; and<br>Heather Fox, a married woman filing<br>12  individually, | CV2010-08.029 |
| 13            Plaintiff, | Case No.:  CV _____ |
| 14  v. | **DEMAND FOR JURY TRIAL** |
| 15  CareerBuilder, LLC, a foreign L.L.C.;<br>16  Mark DeChant and Jane Doe DeChant,<br>husband and wife; Andrew Streiter;<br>17  Hunter Arnold; Stacey Swanson; John<br>and Jane Does I-X; Red Limited<br>18  Liability Companies I-X; Black<br>Corporations I-X; and White<br>19  Partnerships I-X, | |
| 20            Defendants. | |

21

22        Pursuant to Ariz.R.Civ.P. 38(b), Plaintiffs file their demand for a jury trial in this

23   matter.

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

-1-

1      **DATED** this 18th day of November, 2010.

2                                 **JACKSON WHITE**

3

4                                 _____
                                  By:    Michael R. Pruitt, SBN 011792
5                                 40 North Center Street, Suite 200
                                  Mesa, Arizona  85201
6                                 *Attorneys for Plaintiffs*

7

8      **ORIGINAL** of the foregoing filed with
       the Clerk of the Court this 18th day of
9      November, 2010.

10     By: _____

11     F:\DEF\Fox, Heather\Pleadings\Demand For Jury Trial.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Michael J. Gray
   Mariette Farag
2  JONES DAY
   77 West Wacker Drive
3  Chicago, Illinois 60601-1692

4  Telephone:   (312) 782-3939
   Facsimile:   (312) 782-8585
5  Email:       mjgray@jonesday.com
                mfarag@jonesday.com
6
   Attorneys for Defendant
7  CAREERBUILDER, LLC

8          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9             IN AND FOR THE COUNTY OF MARICOPA

10

11 Jamie L. Basham, a single woman; and
   Heather Fox, a married woman filing
12 individually,                              **Case No. CV2010-081029**

13              Plaintiff,                     **WAIVER OF SERVICE
                                              OF SUMMONS**
14        v.

15 CareerBuilder, LLC, a foreign L.L.C.;
   Mark DeChant and Jane Doe DeChant,
16 husband and wife; Andrew Streiter;
   Hunter Arnold; Stacey Swanson; John and
17 Jane Does I-X; Red Limited Liability
   Companies I-X; Black Corporations I-X;
18 and White Partnerships I-X,

19              Defendants.

20        TO:    **Michael R. Pruitt
21               JACKSON WHITE
                 40 North Center Street
22               Mesa, Arizona 85201**
                 *Attorneys for Plaintiff*
23

24

25        I acknowledge receipt of your request that I waive service of a summons on

26 behalf of CareerBuilder, LLC in the action of *Jamie L. Basham and Heather Fox v.*

27 *CareerBuilder, LLC, et al.*, which is case number CV2010-081029 in the Superior Court

28 for the State of Arizona in Maricopa County.  I also have received two copies of the

CHI-1794452v1

1  Complaint in the action, two copies of this instrument, and a means by which I can
2  return the signed waiver to you without cost to me.

3       I agree to save the cost of service of a summons and an additional copy of the
4  Complaint in this lawsuit by not requiring that I (or the entity on whose behalf I am
5  acting) be served with judicial process in the manner provided by the Rules of Civil
6  Procedure.

7       I (or the entity on whose behalf I am acting) will retain all defenses or objections
8  to the lawsuit or to the jurisdiction or venue of the court except for objections based on
9  a defect in the summons or in the service of the summons.

10      I understand that a judgment may be entered against me (or the party on whose
11 behalf I am acting) if an answer or motion under Rule 12 is not served upon you within
12 sixty (60) days after February 25, 2011 or within ninety (90) days after the date if the
13 request was sent outside the United States.

       **DATED** this 8th day of March 2011.

16                                      Michael J. Gray
17                                      Mariette Farag
18                                      JONES DAY
                                        77 West Wacker Drive
19                                      Chicago, Illinois 60601-1692
                                        mjgray@jonesday.com
20                                      mfarag@jonesday.com

21                                      Telephone:     (312) 782-3939
                                        Facsimile:     (312) 782-8585

CHI-1794452v1                           2

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Constance White
Filing ID 826496
3/17/2011 4:10:00 PM

# JACKSONWHITE

### ATTORNEYS AT LAW
*A Professional Corporation*

40 North Center Street, Suite 200
Mesa, Arizona   85201
Telephone No.:      (480) 464-1111
Facsimile No.:      (480) 464-5692
Email:        centraldocket@jacksonwhitelaw.com
*Attorneys for Plaintiffs*
By:    Michael R. Pruitt, SBN 011792
       Email:        mpruitt@jacksonwhitelaw.com

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Jamie L. Basham, a single woman; and Heather Fox, a married woman filing individually,<br><br>               Plaintiffs,<br><br>v.<br><br>CareerBuilder, LLC, a foreign L.L.C.; Mark DeChant and Jane Doe DeChant, husband and wife; Andrew Streiter; Hunter Arnold; Stacey Swanson; John and Jane Does I-X; Red Limited Liability Companies I-X; Black Corporations I-X; and White Partnerships I-X,<br><br>               Defendants. | Case No.:  CV2010-081029<br><br>**MOTION FOR ENLARGMENT OF TIME IN WHICH TO SERVE DEFENDANTS MARK DeCHANT AND JANE DOE DeCHANT, HUNTER ARNOLD, AND STACEY SWANSON**<br><br>**AND**<br><br>**MOTION FOR ALTERNATIVE SERVICE**<br><br>(Assigned to the Honorable Karen Potts) |

      Pursuant to A.R.Civ.P. 6(b) and 4.2(f), Plaintiffs Jamie Basham and Heather Fox, by and through their undersigned counsel, hereby move for an Order enlarging the time in which to serve Defendants Mark DeChant and Jane Doe DeChant, Hunter Arnold, and Stacey Swanson, for a period of 90 days, and allowing alternative service.  The time prescribed by A.R.Civ.P. 4(i) for service will expire on March 18, 2011, and the requested extension is necessary for the reason that Plaintiffs are still in the process of locating and attempting to serve Defendants Mark DeChant and Jane Doe DeChant,

1   Hunter Arnold, and Stacey Swanson.  Additionally, Plaintiffs believe that some of the

2   Defendants may be avoiding service and request that they be allowed to serve process by

3   an alternative means.

4        This Motion is supported by the accompanying Memorandum of Points and

5   Authorities which is incorporated herein by this reference.

6                    **MEMORANDUM OF POINTS AND AUTHORITIES**

7        Pursuant to A.R.Civ.P. 6(b) and 4.2(f), Plaintiffs Jamie Basham and Heather Fox

8   submit there is good cause to grant their Motion For Enlargement of Time to Serve Mark

9   DeChant and Jane Doe DeChant, Hunter Arnold, and Stacey Swanson and Motion For

10  Alternative Service.  On February 25, 2011, counsel for Plaintiffs sent by email and

11  regular mail Notice(s) of Lawsuit and Request For Waiver of Service of Summons' and

12  Waivers of Service of Summons' to the Attorney he believed represented the Defendants

13  requesting that she sign the Waivers of Service of Summons' on behalf of all of the

14  Defendants.  Having received no response to this request, on March 2, 2011, counsel for

15  Plaintiffs' office contacted the Attorney to whom the Waivers of Service of Summons'

16  were sent, Attorney Mariette Farag, and was told that she had been authorized to accept

17  service on behalf of Defendant CareerBuilder, LLC and she was attempting to find out if

18  she was authorized to accept service on behalf of any of the individual Defendants.

19  Later that same morning, Ms. Farag emailed counsel for Plaintiffs that she had been

20  authorized to accept service on behalf of Defendant CareerBuilder, LLC, but was unable

21  to accept service on behalf of the individual Defendants because she was not

22  representing them at this time.

23       Counsel for Plaintiffs located an address in Arizona for Defendants Mark

24  DeChant and Jane Doe DeChant and attempted to have them served with a copy of the

25  Summons and Complaint.  Unfortunately, the residence was vacant and there is a for

26  sale sign in the window.  A copy of an Affidavit of Attempted Service of Mark DeChant

27  and Jane Doe DeChant is attached hereto as Exhibit A.  Plaintiffs are actively searching

28

for a current address for Defendants Mark DeChant and Jane Doe DeChant to complete service of process.

Simultaneously, counsel for Plaintiffs attempted to have Defendants Andrew Streiter, Hunter Arnold, and Stacey Swanson served at CareerBuilder's corporate offices in Chicago, Illinois where these Defendants are currently employed. The process server was told that Mr. Streiter and Mr. Arnold were unavailable to accept service and that Ms. Swanson was currently working out of the country in the UK (United Kingdom) for the next two to three months. Copies of Affidavits of Attempted Service of Hunter Arnold and Stacey Swanson are attached hereto as Exhibits B and C, respectively.

Through investigation, counsel for Plaintiffs located home addresses for Defendants Andrew Streiter and Hunter Arnold. Defendant Andrew Streiter was served on March 13, 2011. However, when service was attempted at the address for Hunter Arnold (358 56th Street, Clarendon Hills, Illinois), the process server was told by an adult male at the residence that Mr. Arnold did not live there. A second address was located for Mr. Arnold (7909 Knottingham Circle, Apt. D, Darien, Illinois) and the process server again attempted service. The process server was told by an adult female at this residence that she was Mr. Arnold's mother and that Mr. Arnold was currently working out of the country. *See* Exhibit B. Upon information and belief, Mr. Arnold is aware of the pending lawsuit and may be avoiding service.

Counsel for Plaintiffs has requested the last known addresses of Mr. Arnold and Ms. Swanson from CareerBuilder through their counsel. Counsel for CareerBuilder has responded to counsel for Plaintiffs that she will check with CareerBuilder to see if this information will be provided. Therefore, Plaintiffs need additional time to serve Mr. and Mrs. DeChant, Mr. Arnold, and Ms. Swanson.

In light of the fact that Plaintiffs have been diligently attempting to locate and serve Mark DeChant and Jane Doe DeChant, Hunter Arnold, and Stacey Swanson, Plaintiffs submit there is good cause for this Court to grant Plaintiffs' Motion For

Enlargement of Time to Serve Defendants Mark DeChant and Jane Doe DeChant, Hunter Arnold, and Stacey Swanson.

Additionally, Plaintiffs request, pursuant to A.R.Civ.P. 4.2(f), that they be permitted to serve process by alternative means on Defendants Hunter Arnold and Stacey Swanson, both of whom are current employees of Defendant CareerBuilder who live out-of-state, by publishing the Summons and a statement as to the manner in which a copy of the Complaint may be obtained, at least once a week for four successive weeks in a newspaper published in Cook County, Illinois, the county of the last known residences of Hunter Arnold and Stacey Swanson.

**RESPECTFULLY SUBMITTED** this 17th day of March, 2011.

**JACKSON WHITE**

      /s/ Michael R. Pruitt
By:    Michael R. Pruitt, SBN 011792
40 North Center Street, Suite 200
Mesa, Arizona   85201
*Attorneys for Plaintiffs*

**ORIGINAL** of the foregoing and Proposed Order
e-filed with the Clerk of the Court this 17th day of
March, 2011.

**COPY** of the foregoing mailed/*hand-delivered
this 17th day of March, 2011, to:

*The Honorable Karen Potts
Southeast Court (SE)
222 E. Javelina
Mesa, Arizona   85210

Michael J. Gray
Mariette Farag
JONES DAY
77 West Wacker Drive
Chicago, Illinois   60601-1692
*Attorneys for Defendant CareerBuilder, LLC*

By:  /s/ Debra Carpenter

F:\DEF\Fox, Heather\Pleadings\Motion For Enlargement of Time.doc
22617.001

-4-

Exhibit A

E-Z MESSENGER
1209 E. Washington Street
Phoenix, AZ 85034
(602) 258-8081  FAX: (602) 258-8864

CLIENT FILE NO.
22617.001 & 22501.00

IN THE ARIZONA SUPERIOR COURT
STATE OF ARIZONA COUNTY OF MARICOPA

**JAMIE L. BASHAM, A SINGLE WOMAN**
        VS
**CAREERBUILDER, LLC**

CASE NO. CV2010-081029

AFFIDAVIT OF
ATTEMPTED SERVICE

STATE OF ARIZONA             )
MARICOPA COUNTY         )
THE AFFIANT, being sworn, states: That I am a private process server registered in
MARICOPA COUNTY and an Officer of the Court.  On 03/07/11 I received the following
documents: SUMMONS; COMPLAINT; CERTIFICATE RE:COMPULSORY ARBITRATION PURSUANT TO
RULE 72; DEMAND FOR JURY TRIAL;, from JACKSON WHITE P.C. and by MICHAEL R. PRUITT
in each instance I personally attempted to serve a copy of each document listed
above upon MARK DECHANT AND JANE DOE DECHANT, HUSBAND AND WIFE on 03/08/11 at 7:51
pm at 20100 N. 78TH PLACE, APT. 2175 SCOTTSDALE, AZ in the manner shown below:

[XX] NOT AT GIVEN ADDRESS
[XX] CHECKED WITH NEIGHBOR / MANAGER

Please see attachment of attempts.

    /s/SUSIE BALDWIN
SUSIE BALDWIN                Affiant
Sworn to before me the  Mar  9, 2011

/s/Jennifer Gomez
                        Notary

My Commission expires:  05/31/2014

AX032055088

2055088 2875 18
CLIENT COPY



```
E-Z MESSENGER
1209 E. Washington Street
Phoenix, AZ 85034
(602) 258-8081  FAX: (602) 258-8864              CLIENT FILE NO.
                                                 22617.001 & 22501.00
IN THE ARIZONA SUPERIOR COURT
STATE OF ARIZONA COUNTY OF MARICOPA
```

**JAMIE L. BASHAM, A SINGLE WOMAN**              CASE NO. CV2010-081029
                                   VS
**CAREERBUILDER, LLC**

                                                 ATTACHMENT OF ATTEMPTS

```
STATE OF ARIZONA                      )
MARICOPA COUNTY                       )
```
SUSIE BALDWIN, states after due search, careful inquiry and diligent attempts at
the address(es), service of the following documents has been unable to be effected
upon MARK DECHANT AND JANE DOE DECHANT, HUSBAND AND WIFE at 20100 N. 78TH PLACE,
APT. 2175 SCOTTSDALE, AZ: SUMMONS; COMPLAINT; CERTIFICATE RE:COMPULSORY ARBITRATION
PURSUANT TO RULE 72; DEMAND FOR JURY TRIAL;

03/08/11  7:34pm by SUSIE BALDWIN ADDRESS IS VACANT.

03/09/11 11:00am by SUSIE BALDWIN ADDRESS IS VACANT. ALL WINDOW COVERINGS ARE OPEN
AND A FOR SALE SIGN IS IN THE WINDOW. NO NEIGHBORS WOULD ANSWER. ONSITE MANAGEMENT
WILL NOT VERIFY.


I certify under penalty of perjury that the foregoing is true and correct and
executed on this date, March 9, 2011.



                        /s/SUSIE BALDWIN

                        2055088     2875
                        CLIENT COPY
```

Exhibit B

Mar. 17. 2011  2:55PM                                                      No. 5145   P. 3

## Affidavit of Process Server

*Jamie L. Bashman, et al* vs *CareerBuilder, LLC et al*   CV2010-08029

Plaintiff/Petitioner        Defendant/Respondent        Case#

Being duly sworn, on my oath, I    *Andrew Raphael*

declare that I am a citizen of the United States, over the age of eighteen and not a party to this action.

**Service:**        I served   *Hunter Arnold*

NAME OF PERSON/ENTITY BEING SERVED

with the (documents)    ☐ Subpoena with $ _____ witness fee and mileage

X  *Summons Complaint Certificate RE: Compulsory*
*Arbitration Pursuant to Rule 72*
*and Demand for Jury Trial*

by serving (NAME) _____

at ☐ Home
   ☐ Business   *200 N LaSalle Suite 1100 Chicago*
   ☐ on (DATE) _____ at (TIME) _____

Thereafter copies of the documents were mailed by prepaid, first class mail on (DATE) _____

From (CITY) _____ (STATE) _____

**Manner of Service:**

☐ By Personal Service

☐ By delivering, during office hours, copies at the office of the person/entity being served, leaving same with the person apparently in charge thereof, namely, _____

☐ By leaving a copy at the defendant's usual place of abode, with some person of the family or a person residing there, of the age of 13 years or upwards, and informing that person of the general nature of the papers

☐ By posting copies in a conspicuous manner to the address of the person/entity being served.

**Non-Service:**    After due search, careful inquiry and diligent attempts at the address(es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):

☐ Unknown at Address      ☐ Evading          ☐ Other: *not available on*
☐ Address does not exist   ☐ Service cancelled by litigant   *either Attempt*
☐ Moved, Left no forwarding ☐ Unable to serve in a timely fashion

**Service Attempts:**  Service was attempted on: (1) *3/8/11 11:00am* (2) *3/8/11 4:45pm* ( )
                                      DATE   TIME      DATE   TIME      DATE   TIME

( )_____  ( )_____  ( )_____  ( )_____
  DATE   TIME      DATE   TIME      DATE   TIME      DATE   TIME

**Description:**   *I have left several messages for him No response*

☐ Male    ☐ White Skin   ☐ Black Hair   ☐ White Hair   ☐ 14-20 Yrs.   ☐ Under 5'    ☐ Under 100 Lbs.
☐ Female  ☐ Black Skin   ☐ Brown Hair   ☐ Balding      ☐ 21-35 Yrs.   ☐ 5'-5'3"     ☐ 100-130 Lbs.
          ☐ Brown Skin   ☐ Blond Hair                  ☐ 36-50 Yrs.   ☐ 5'4"-5'8"   ☐ 131-160 Lbs.
☐ Glasses ☐ Yellow Skin  ☐ Gray Hair    ☐ Mustache     ☐ 51-65 Yrs.   ☐ 5'9"-6'     ☐ 161-200 Lbs.
          ☐ Red Skin     ☐ Red Hair     ☐ Beard        ☐ Over 65 Yrs. ☐ Over 6'     ☐ Over 200 Lbs.

~~OTHER IDENTIFYING FEATURES:~~   *Was told he was in town*
*On 2nd Attempt*

State of Illinois  County of Cook

Subscribed and sworn to before me
A notary public, this ___ day of *March*, 20 *11*

_____
Notary Public

SERVED BY
LASALLE PROCESS SERVERS
ILLINOIS PRIVATE DETECTIVE LICENSE# 117-001432

OFFICIAL SEAL
BETHZAIDA PEREZ
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-22-2014

CHARTER MEMBER NATIONAL ASSOCIATION OF PROFESSIONAL PROCESS SERVERS

Mar. 17. 2011  2:55PM                                                                    No. 5145    P. 4

## Affidavit of Process Server

Jamie L. Bashman, etc.         CareerBuilder, LLC et al   CV2010-081029
_Plaintiff/Petitioner_            _Defendant/Respondent_              _Case#_

Being duly sworn, on my oath, I    Karl Brown
declare that I am a citizen of the United States, over the age of eighteen and not a party to this action.

**Service:**    I served    Hunter Arnold
                              NAME OF PERSON/ENTITY BEING SERVED

with the (documents)   ☐ Subpoena with $ _____ witness fee and mileage

X  Summons Complaint, Certificate Re:
Compulsory Arbitration Pursuant to
Rule 72 and Demand for Jury Trial

by serving (NAME) _____

at ☐ Home     _____

☐ Business   _____

☐ on (DATE) _____     at (TIME) _____

Thereafter copies of the documents were mailed by prepaid, first class mail on (DATE) _____

From (CITY) _____                              (STATE) _____

**Manner of Service:**

☐ By Personal Service

☐ By delivering, during office hours, copies at the office of the person/entity being served, leaving same with the person apparently in charge thereof, namely, _____

☐ By leaving a copy at the defendant's usual place of abode, with some person of the family or a person residing there, of the age of 13 years or upwards, and informing that person of the general nature of the papers

☐ By posting copies in a conspicuous manner to the address of the person/entity being served.

**Non-Service:**    After due search, careful inquiry and diligent attempts at the address(es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):

☐ Unknown at Address    ☒ Evading    ☐ Other: _See Service Notes_
☐ Address does not exist    ☐ Service cancelled by litigant    _Attached_
☐ Moved, Left no forwarding    ☐ Unable to serve in a timely fashion

**Service Attempts:**  Service was attempted on: ( ) 3-11-11  4:50 PM ( ) 3-15-11 10:50 AM ( ) 3-15-11 8:17 PM

( ) 3-10-11 7:55 PM ( ) 3-12-11 4:40 PM ( ) 3-15-11 4:55 PM ( )
DATE    TIME           DATE    TIME           DATE    TIME           DATE    TIME

**Description:**  ☐ Male     ☐ White Skin    ☐ Black Hair    ☐ White Hair   ☐ 14-20 Yrs.   ☐ Under 5'    ☐ Under 100 Lbs.
☐ Female   ☐ Black Skin    ☐ Brown Hair   ☐ Balding    ☐ 21-35 Yrs.   ☐ 5'-5'3"    ☐ 100-130 Lbs.
                   ☐ Brown Skin    ☐ Blond Hair               ☐ 36-50 Yrs.   ☐ 5'4"-5'8"   ☐ 131-160 Lbs.
☐ Glasses  ☐ Yellow Skin   ☐ Gray Hair    ☐ Mustache   ☐ 51-65 Yrs.   ☐ 5'9"-6'    ☐ 161-200 Lbs.
                   ☐ Red Skin      ☐ Red Hair     ☐ Beard     ☐ Over 65 Yrs. ☐ Over 6'    ☐ Over 200 Lbs.

OTHER IDENTIFYING FEATURES: _____

State of Illinois  County of Cook

Subscribed and sworn to before me                                    Karl Brown
A notary public, this 17 day of MARA , 20 11                         SERVED BY
                                                                      LASALLE PROCESS SERVERS
                                                                      ILLINOIS PRIVATE DETECTIVE LICENSE# 117-001432

Notary Public _____

OFFICIAL SEAL
ANDREW RAPHAEL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-17-2011

CHARTER MEMBER NATIONAL ASSOCIATION OF PROFESSIONAL PROCESS SERVERS

Service Notes

Hunter Arnold

03/10/2011 07:56pm   (#1) 358 56th Street  Clarendon Hills, Illinois  60514        No answer. No lights on.  No cars present.

03/11/2011 04:40pm   No answer.  No cars present.

03/12/2011 04:10pm   Jim Czeszewski (W,M,35) answers door.  He states that Hunter Arnold does not live at this address, and that he does not know Hunter.

03/15/2011 10:50am   (#2) 7909 Knottingham Circle  Darrien, Illinois    Elaine Danenhauer (W,F,65) answers door. She states that she is the mother of Hunter Arnold, and that Hunter owns her residence. She further states that Hunter is travelling out of the country. I informed her that I had a court summons for her son.  She was unwilling to provide contact information regarding her son.  I left my business card, and requested that she have her son contact me.

03/15/2011 4:55pm    (#1) No answer.  White 2 door car parked in driveway.  Lights on.  Dog inside, but it does not bark, even with intense knocking and bell ringing.

03/15/2011 08:19pm   Lights on in several rooms of house.  No answer.  White 2 door car still parked in driveway.

Process Server: _____   Date: ___3-15-11___

Exhibit C

Mar. 14. 2011  4:35PM                                              No. 5117   P. 4

## Affidavit of Process Server

*Jamie L. Bashman, etal*     *CareerBuilder, LLC, etal*     *CV2010-081029*
Plaintiff/Petitioner        Defendant/Respondent        Case#

Being duly sworn, on my oath, I    *Andrew Rafad*
declare that I am a citizen of the United States, over the age of eighteen and not a party to this action.

**Service:**    I served   *Stacey Swanson*
            NAME OF PERSON/ENTITY BEING SERVED

with the (documents)    □ Subpoena with $ _____   witness fee and mileage

X *Summons, Complaint, Certificate Re:*
*Compulsory Arbitration Pursuant to*
*Rule 72 and Demand for Jury Trial*

by serving (NAME) _____

at □ Home

□ Business   *200 N. LaSalle St, Suite 1100 Chicago Il*

□ on (DATE) _____ at (TIME) _____

Thereafter copies of the documents were mailed by prepaid, first class mail on (DATE) _____

From (CITY) _____ (STATE) _____

**Manner of Service:**

□ By Personal Service

□ By delivering, during office hours, copies at the office of the person/entity being served, leaving same with the person apparently in charge thereof, namely, _____

□ By leaving a copy at the defendant's usual place of abode, with some person of the family or a person residing there, of the age of 13 years or upwards, and informing that person of the general nature of the papers _____

□ By posting copies in a conspicuous manner to the address of the person/entity being served. _____

**Non-Service:** After due search, careful inquiry and diligent attempts at the address(es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):

□ Unknown at Address    □ Evading    ☑ Other: *I was told that she is*
□ Address does not exist    □ Service cancelled by litigant   *in the UK for 2-3 months*
□ Moved, Left no forwarding    □ Unable to serve in a timely fashion

**Service Attempts:** Service was attempted on: (1) *3/01/11 11:20 am* (2) *3/8/11 1:45 pm* ( )
       DATE     TIME       DATE    TIME

( ) _____ ( ) _____ ( ) _____ ( ) _____
DATE   TIME      DATE     TIME      DATE    TIME      DATE    TIME

**Description:**

| | | | | | | |
|---|---|---|---|---|---|---|
| □ Male | □ White Skin | □ Black Hair | □ White Hair | □ 14-20 Yrs. | □ Under 5' | □ Under 100 Lbs. |
| □ Female | □ Black Skin | □ Brown Hair | □ Balding | □ 21-35 Yrs. | □ 5'-5'3" | □ 100-130 Lbs. |
| | □ Brown Skin | □ Blond Hair | | □ 36-50 Yrs. | □ 5'4"-5'8" | □ 131-160 Lbs. |
| □ Glasses | □ Yellow Skin | □ Gray Hair | □ Mustache | □ 51-65 Yrs. | □ 5'9"-6' | □ 161-200 Lbs. |
| | □ Red Skin | □ Red Hair | □ Beard | □ Over 65 Yrs. | □ Over 6' | □ Over 200 Lbs. |

OTHER IDENTIFYING FEATURES: _____

State of Illinois  County of Cook

Subscribed and sworn to before me
A notary public, this ___ day of *March 11*

_____
Notary Public

OFFICIAL SEAL
BETHZAIDA PEREZ
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 1-22-2014

SERVED BY
LASALLE PROCESS SERVERS
PRIVATE DETECTIVE LICENSE# 117-001432

**CHARTER MEMBER NATIONAL ASSOCIATION OF PROFESSIONAL PROCESS SERVERS**

Michael K. Jeanes, Clerk of Court
*** Filed ***
3/31/2011
8:00a.m.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2010-081029                                    03/30/2011

                                          CLERK OF THE COURT
HONORABLE KAREN POTTS                            M. Scott
                                                 Deputy


JAMIE L BASHAM, et al.              MICHAEL R PRUITT

v.

CAREERBUILDER L L C, et al.         CAREERBUILDER L L C
                                    C/O JONES DAY
                                    77 WEST WACKER DRIVE
                                    CHICAGO IL  60601-1692


                                    HUNTER ARNOLD
                                    NO ADDRESS ON RECORD
                                    MARK DECHANT
                                    NO ADDRESS ON RECORD
                                    KAREN DECHANT
                                    NO ADDRESS ON RECORD
                                    ANDREW STREITER
                                    NO ADDRESS ON RECORD
                                    STACEY SWANSON
                                    NO ADDRESS ON RECORD


MINUTE ENTRY

     The Court has considered Plaintiff's Motion for Enlargement of Time in Which to Serve
Defendants Mark DeChant and Jane Doe DeChant, Hunter Arnold, and Stacey Swanson and
Motion for Alternative Service. The Court finds good cause to extend the time for service for the
foregoing named Defendants.

     **IT IS ORDERED** extending the time in which to serve Defendants Mark DeChant and
Jane Doe DeChant, Hunter Arnold, and Stacey Swanson to June 18, 2011.

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CV 2010-081029                                              03/30/2011

The Court further finds that service under Ariz.R.Civ.P. 4.1(d) is impracticable as to Defendants Hunter Arnold and Stacey Swanson, but imposes the following additional requirements to best ensure said Defendants are given notice of the Complaint:

**IT IS ORDERED** that Plaintiff may serve Defendants Hunter Arnold and Stacey Swanson by:

1. Mailing a copy of the Summons, Complaint, this Order, and any other paper filed with the Complaint via the U.S. Postal Service at the Defendants' last known business address as set forth in the Motion (CareerBuilder's corporate offices in Chicago, Illinois) by (a) regular mail, and (b) registered mail with delivery confirmation, and (c) registered mail with signature confirmation; <u>and</u>
2. Attaching/posting a copy of the Summons, Complaint, this Order, and any other paper filed with the Complaint to the front door of Defendant's Hunter Arnold's mother's residential dwelling as set forth in the Motion; <u>and</u>
3. Publishing said Summons and Complaint at least once a week for four successive weeks in a newspaper published in Cook County, Illinois.
4. Filing an affidavit attesting to service in accordance with the foregoing paragraphs within ten days of compliance.

Defendants are advised that they must answer the Complaint in this matter within the time mandated by the Arizona Rules of Civil Procedure once service is accomplished as set forth in this Order. Failure to so answer may result in the entry of a default judgment.


_____

JUDICIAL OFFICER OF THE SUPERIOR COURT

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Orders 2010-117 and 2011-10 to determine their mandatory participation in eFiling through AZTurboCourt.

FROM COSC Support Service 6026962618 (WED) APR 6 2011 18:01/ST. 18:00/No. 7303131352 P 2

MICHAEL K. JEANES, CLERK
RECEIVED CCC #5
DOCUMENT DEPOSITORY

11 MAR 22 AM 10: 15
FILED
BY *Crockett* DEP.

E-Z MESSENGER
1209 E. Washington Street
Phoenix, AZ 85034
(602) 258-8081  FAX: (602) 258-8864

CLIENT FILE NO.
22617.001 & 22501.00

IN THE ARIZONA SUPERIOR COURT
STATE OF ARIZONA COUNTY OF MARICOPA

**JAMIE L. BASHAM, A SINGLE WOMAN**
VS
**CAREERBUILDER, LLC**

CASE NO. CV2010-081029

STATE OF ARIZONA                          )          AFFIDAVIT OF SERVICE
MARICOPA COUNTY                        )

THE AFFIANT, being sworn, states: That I am a private process server registered in
MARICOPA COUNTY and an Officer of the Court.  On 03/07/11 I received the SUMMONS;
COMPLAINT; CERTIFICATE RE:COMPULSORY ARBITRATION PURSUANT TO RULE 72; DEMAND FOR
JURY TRIAL;

from JACKSON WHITE P.C. and by MICHAEL R. PRUITT in each instance I personally
served a copy of each document listed above upon:
MARK DECHANT AND JANE DOE DECHANT, WHOSE TRUE NAME IS KAREN DECHANT, HUSBAND AND
WIFE on 03/20/11 at 5:02 pm at 20100 N. 78TH PLACE, APT. 2175 SCOTTSDALE, AZ
MARICOPA COUNTY in the manner shown below:

by leaving true copy(ies) of the above documents with MARK DUCHANT,
HUSBAND/CO-OCCUPANT in person, a person of suitable age and discretion residing
within their usual place of abode located at the above address.

Description: WHITE, Male, Approx. 45 yrs. of age, 6' 0" tall, Weighing 220lbs.,
BROWN Eyes, BROWN Hair,

|  |  |  |
|---|---|---|
| SERVICE OF PROCESS | $ | 32.00 |
| MILES          28 | $ | 67.20 |
| FEES PAID | $ | 18.00 |
| LOCATE | $ | 75.00 |
| SKIPTRACE DATABASE | $ | 19.00 |
| MVD | $ | 25.00 |
| SERVICE CHARGE | $ | 8.00 |
| AFFIDAVIT PREP/NOTARY | $ | 10.00 |
| TOTAL | $ | 254.20 |

MICHAEL MONSON, ACPS                  Affiant
Sworn to before me the Mar 21, 2011

JoAnn Romo                               Notary

My commission expires:  04/27/2014

AX022055088

2055088/ 2875 18
ORIGINAL

OFFICIAL SEAL
JOANN ROMO
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Comm. Exp. April 27, 2014

Mar. 14. 2011  4:35PM

No. 5117   P. 3
Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Julieta Garcia
Filing ID 8261191 8/12
Case#

## Affidavit of Process Server

_Daniel Bashman, Etal_   _CareerBuilder, LLC etal_
Plaintiff/Petitioner              Defendant/Respondent

Being duly sworn, on my oath, I _MICHAEL JENSON_
declare that I am a citizen of the United States, over the age of eighteen and not a party to this action.

Service: I served _Andrew Streiter_
NAME OF PERSON/ENTITY BEING SERVED

with the (documents)  ☐ Subpoena with $ _____ witness fee and mileage

X _Summons, Complaint, Certificate Re: Compulsory Arbitration pursuant to Rule 72 and Demand for jury trial_

by serving (NAME) _ANDREW STREITER_
at ☒ Home _690 N Lake Shore Dr. (Chicago)_
☐ Business
☒ on (DATE) _3.13.11_   at (TIME) _10:45 am_

Thereafter copies of the documents were mailed by prepaid, first class mail on (DATE) _____

From (CITY) _____   (STATE) _____

Manner of Service:
☒ By Personal Service
☐ By delivering, during office hours, copies at the office of the person/entity being served, leaving same with the person apparently in charge thereof, namely,

☐ By leaving a copy at the defendant's usual place of abode, with some person of the family or a person residing there, of the age of 13 years or upwards, and informing that person of the general nature of the papers

☐ By posting copies in a conspicuous manner to the address of the person/entity being served.

Non-Service:
After due search, careful inquiry and diligent attempts at the address(es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):
☐ Unknown at Address    ☐ Evading    ☐ Other:
☐ Address does not exist    ☐ Service cancelled by litigant
☐ Moved, Left no forwarding    ☐ Unable to serve in a timely fashion

Service Attempts: Service was attempted on: ( )_____ ( )_____ ( )_____
( )_____ ( )_____ ( )_____

Description:
☒ Male ☐ White Skin ☐ Black Hair ☐ White Hair ☐ 14-20 Yrs. ☐ Under 5' ☐ Under 100 Lbs.
☐ Female ☒ Black Skin ☒ Brown Hair ☐ Balding ☒ 21-35 Yrs. ☐ 5'-5'3" ☐ 100-130 Lbs.
☐ Brown Skin ☐ Blond Hair ☐ 36-50 Yrs. ☐ 5'4"-5'8" ☐ 131-160 Lbs.
☐ Glasses ☐ Yellow Skin ☐ Gray Hair ☐ Mustache ☐ 51-65 Yrs. ☒ 5'9"-6' ☒ 161-200 Lbs.
☐ Red Skin ☐ Red Hair ☐ Beard ☐ Over 65 Yrs. ☐ Over 6' ☐ Over 200 Lbs.

OTHER IDENTIFYING FEATURES:

State of Illinois  County of Cook

Subscribed and sworn to before me
A notary public, this _14th_ day of _March_ 20_11_

Notary Public

OFFICIAL SEAL
BETHZAIDA PEREZ
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-22-2014

SERVED BY
LASALLE PROCESS SERVERS
ILLINOIS PRIVATE DETECTIVE LICENSE# 117-001432

CHARTER MEMBER NATIONAL ASSOCIATION OF PROFESSIONAL PROCESS SERVERS